COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Russell and Raphael
Argued at Richmond, Virginia

KATHRYNE HAMPSHIRE FOSTER

MEMORANDUM OPINION[*] BY
v.      Record No. 1141-21-2      JUDGE WESLEY G. RUSSELL, JR.
JUNE 21, 2022

LARRY ALLEN FOSTER, JR.

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

John S. Koehler (Law Office of James Steele, PLLC, on brief), for
appellant.

Juli M. Porto (Blankingship & Keith, P.C., on brief), for appellee.

Kathryne Hampshire Foster (wife) and Larry Allen Foster, Jr. (husband) were divorced by

order of the trial court, which subsequently also provided for equitable distribution of the parties'

marital estate and awarded wife lump sum spousal support. On appeal, wife challenges the trial

court's classification of certain stock, the form and amount of the spousal support award, and how

the trial court conducted the proceedings given her claimed disability. For the reasons that follow,

we affirm the judgment of the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

The parties were married in April 2000, and they separated in December 2018. Two children were born of the marriage, a daughter born in February 2005 and a son born in April 2008.

Husband made the vast majority of financial contributions to the family. When the parties married, husband was a practicing attorney earning $50,000 a year. Thereafter, at a South Carolina law firm, his annual salary progressed from $65,000 to $125,000. In 2006, husband began a new career in real estate with his family's company, Long & Foster, and the parties moved to northern Virginia. He became a regional manager for the company, where he earned $150,000 per year until 2010, when his annual salary increased to $250,000, plus bonuses. By 2015, he was earning a salary of $600,000. In the year the parties separated, husband had income surpassing $1 million, which included $750,000 base salary, a $400,000 retention bonus, and an "earn out" from the 2017 sale of the company. Husband's income is anticipated to decrease because of the five-year limit of the earn out and uncertainty about his potential role in the new firm.

When, in late 2015, there were discussions about the sale of Long & Foster, husband's uncle, Wes Foster ("uncle"), devised a plan through which a family trust was to provide husband money with which husband was then to buy company stock. A promissory note granting husband $4,272,912 was executed on January 16, 2016. The note reflected that husband would repay the amount within three years with .75% interest. On January 21, 2016, husband purchased 1,008 shares of Long & Foster stock. No payments were ever made on the note, and it ultimately was forgiven a few months later. When Long & Foster eventually was sold in 2017, husband used proceeds from the purchase of his ownership shares to buy some real estate.

[1] "As an appellate court, we view the evidence, and all reasonable inferences flowing from the evidence, in a light most favorable to . . . the party prevailing below[,]" here husband. *Miller v. Cox*, 44 Va. App. 674, 678 (2005). This "requires us to 'discard the evidence' of the appellant which conflicts, either directly or inferentially, with the evidence presented by the appellee at trial." *Id.* (quoting *Congdon v. Congdon*, 40 Va. App. 255, 258 (2003)).

Although wife was employed when the parties married, she stopped working a year later. When the children were born, wife was their primary caretaker, but in 2010, an *au pair* was hired to take on that role. Wife took on some painting and decorating responsibilities at each of their homes and did the laundry for much of the marriage. In 2013, wife fell down the stairs and twisted her ankle. Since the incident, wife has maintained that she is disabled and therefore unemployable and in need of assistance with managing the home.

In 2014, the parties moved from northern Virginia to the Charlottesville area in order for their daughter to attend a special school. In light of wife's condition, Julie Jones was hired to assist with housekeeping and childcare duties; she first worked twice a week but soon provided services five days a week until 2019. Jones cleaned, to include picking up after the children, dishes, and laundry; went grocery shopping; drove wife to doctor appointments and the children to their activities; and maintained a family calendar. Wife developed a severe sensitivity to light, sound, and smells that triggered migraines, and she thereafter stayed mostly in bed.

In part due to wife's spending habits, the parties enjoyed a more-than-comfortable lifestyle: they lived in a million-dollar home and owned a condominium in Reston; several vehicles, including a Mercedes convertible and a NASCAR pace car bought by wife; and a horse and horse trailer. They were able to acquire numerous bank, insurance, and retirement accounts. Much of the wealth, however, was acquired late in the marriage and just a few years prior to separation. Post-separation, wife purchased a miniature horse for $7,500 to serve as her service animal.

In January 2019, wife initiated divorce proceedings, and after protracted litigation, the parties were divorced by decree entered on December 9, 2020. The proceedings included many continuances at the behest of wife, who had significant difficulty complying with discovery and with maintaining relationships with the many attorneys she retained to represent her but who eventually would withdraw from that representation. Because the divorce decree "reserve[d] the

issues of . . . spousal support, equitable distribution, and attorney's/expert's fees and costs for future adjudication" further litigation ensued.[2] *Pendente lite*, husband paid all of the household expenses as well as $5,000 in monthly spousal support.

A multi-day hearing on equitable distribution, spousal support, and attorney fees was held in June 2021. Like most of the proceedings, the parties' mutual enmity made the hearing extremely difficult, with husband's mere presence causing distress and difficulty for wife.[3] As the trial court later explained in its letter opinion, the mere presence of husband

> was such a trigger that [wife] was concerned about being in the same room with him. The [trial c]ourt permitted her to be present in a conference room in the courthouse to make sure her concern was properly addressed. While [wife] did choose to be physically in the courtroom for most of the trial, a deputy was required to stand between [wife] and [husband] to prevent any adverse reactions from her seeing him. In fact, partway through the trial, [husband] was forced to sit in the back of the room, and only returned to counsel table once the noise of [counsel] communicating with [husband] triggered [wife] further. [Wife] was then unable to appear the next day due to her migraines from the trial.

Multiple witnesses were called over the course of the trial, including husband, wife, and Jones. Collectively, their testimony established the marital history, the breakdown of the marriage, the respective roles the parties and others played in both the marriage and its breakdown, and other salient facts. Although that testimony was necessary for the trial court to

---

[2] Issues related to child custody and visitation were resolved by separate order entered on February 17, 2021; husband was awarded sole legal and primary physical custody and wife was granted limited visitation.

[3] During her testimony, wife complained of "flashbacks" and of being in "a multi-dimensional triggered state" from being "in the room with the man that" she alleged "would punish me harshly" for spending money on groceries. In addition, wife often failed to answer questions related to "triggering" subjects, including her spending and expenses and her failure to exercise visitation; in evading these questions, wife claimed, "I need help from my ADA advocate to answer that question." She asserted, "I understand that you all don't understand what it's like to have complex PTSD and to be triggered[.]"

conduct its review of the factors contained in Code §§ 20-107.1 and 20-107.3 as it related to its ultimate decisions regarding spousal support and equitable distribution, we need not summarize all of it here because much of it is unnecessary to the narrow issues we confront on appeal—the classification of the Long & Foster stock (and the resulting proceeds from its sale) as husband's separate property and the lump sum spousal support award.

To establish that the stock was his separate property, husband adduced evidence to establish that it was a gift from uncle. In support of that claim, husband called Bruce Enger, who had served as CFO of Long & Foster and oversaw the company's "financial and accounting activities," to testify about the transactions involved in husband's stock acquisition. Enger stated that he had known husband for twelve years but did not recall ever meeting wife. Enger relayed that toward the end of 2015, uncle, who was chairman of the company, had a general plan of "moving ownership . . . to other family members." Enger recounted that uncle "had a dollar amount in mind and he said he wanted to get $10 million to" husband, and Enger "was directed to figure out a way to get [him] some ownership of the company" equal to that value.

Enger then explained that he

> figured out . . . how much these shares of the company might be
> worth in a transaction, and then structured it as a loan from [uncle]
> to [husband], to purchase those shares . . . [so that] ultimately, that
> loan would be forgiven as a gift, and then [husband] would own
> the shares. And then, . . . at some point in time, the company
> would likely be sold.

Enger added that husband's stock acquisition was structured as such "so that it wouldn't end up being a taxable situation. It would be just a gift from [uncle] to [husband]." The structure was designed so that "[t]he tax basis, instead of it being a $10-million gift, it ends up being, in this case, a $4.3-million gift." Enger noted that similar efforts were made with other family members.

Enger shared emails that had been exchanged with husband. Admitted as exhibit 57, the January 2016 emails were designed to "memorialize[] [their] conversation" about the "[s]tock sale

transaction." The communication included slides Enger had prepared proposing how "gifting shares to [husband]" was to occur; the slides and corresponding emails indicated that uncle intended to forgive the promissory note as a "gift."

Jonathon Wagy, the president of the Foster Family Office and responsible for overseeing the "financial planning and analysis for the extended Foster family, across three generations, and all of their related business interests [and] trusts," also testified to how husband came to own Long & Foster stock. He noted his perception that the series of transactions was "part of the financial management of the family affairs" and designed "to increase [husband's] ownership in the operating company." He noted that he had had no interactions with wife. During his testimony, Wagy commented on the 2016 tax returns of uncle and his wife. He referred to the document as the "Fulsome gift-tax return" and indicated that it "reflects the value of the gift of forgiven loan to [husband]." Wagy affirmed that he had created the document and that it was intended to "report a gift from [uncle] and [uncle's wife] to [husband]" and not to wife. In structuring the transaction so as to be a gift to husband alone and not to husband and wife, uncle and his wife suffered significant tax consequences. Had wife also been intended as a donee, uncle and his wife each would have been able to avail themselves of an additional $14,000 gift-tax exclusion as permitted under federal law.

Husband's testimony corroborated the gift nature of the scheme. He averred that his acquisition of the Long & Foster stock "was always intended to be a gift." Husband relayed that he and uncle had had a discussion in late 2015 regarding selling the company and securing husband's financial future; husband testified that uncle "wanted to gift stock to me that would be worth about $10 million" and asked Enger to find a tax-efficient way of doing so. Husband recounted that, when he received the roughly $4.3 million under the promissory note, he had no means by which to repay a loan of that amount and that there was "[n]ever an intent for me to

pay anything on it[,]" including interest. The evidence established that no payments of either interest or principal were ever made on the note or to purchase the stock, and therefore, no marital funds or other marital property were involved in the transaction.

The trial court ruled on equitable distribution and spousal support in a detailed single-spaced, twenty-three-page letter opinion. The trial court first classified and valued the parties' property. The trial court afforded the Long & Foster stock particular consideration, ultimately determining the stock to be husband's separate property. "The loan for $4,272,912.00 was entered into on January 16, 2016. The shares of Long & Foster were purchased on January 21, 2016." Although the trial court acknowledged that the property had been acquired during the marriage, it considered dispositive "the intent of the parties involved to give and receive a gift" and found that "the presumption that the purchase of the stock was marital property is clearly rebutted by the evidence showing it was intended to be a gift."

The trial court found that "[t]he intent of all the parties for [uncle] to gift the stock to [husband] was visibly established in the emails and testimony of the officers of Long & Foster at the trial." On that basis, the trial court "rule[d] the stock purchase was a gift from [uncle] to [husband] alone" and concluded that "the stock purchase is . . . the separate property of [husband]."

In determining that the stock and its proceeds were husband's separate property, the trial court credited the testimony of Enger and Wagy in making its findings. Based on their evidence, the trial court more specifically found that uncle

> wanted to give 10 million dollars to [husband] structured in such a way as to lower the tax basis below 10 million dollars by making part of it as a gift from [him] to his nephew.
>
> To accomplish the necessary structuring, four million dollars were loaned to [husband] on an unsecured promissory note to give him the initial capital to buy shares of Long & Foster stock. . . . Consistent with the intent to gift the stock, there were no payments ever made on this note. [Husband] used that money to buy 1008

- 7 -

shares in the company from a trust owned and controlled by [uncle]. The promissory note was then forgiven, and the debt released . . . .

[T]he purpose of the structure of the transaction was to increase [husband's] ownership in the Long & Foster company while permitting the issuance and forgiveness of the loan to comply with IRS regulations.

The plan transpired exactly as it had been planned. Every step of this transaction was part of one gift. [Husband] purchased the shares as it was structured in the gift plan.

The trial court also found that husband would not have participated in the transaction if it had not been understood from the beginning that, because a gift was intended, he was not obligated to make any payments related to the note or stock. In evaluating that testimony and the transaction as a whole, the trial court concluded that an "explicit promise" had been made to forgive the loan and that the "promise was used to induce [husband] to participate in the gifting scheme. [Husband] testified at trial he would not have accepted the loan without the promise of the forgiveness of the loan as he did not have the funds to pay it back."

Having determined that the stock was husband's separate property, the trial court also classified as his separate property the proceeds husband had received from selling his shares upon the sale of the company. The trial court further traced those funds to the purchase of some real estate, which parcels also were deemed husband's separate property. The trial court consequently excluded the value of the stock and the real estate from the marital estate subject to equitable distribution.

After classifying and valuing the remaining assets, the trial court considered the factors mandated by Code § 20-107.3 and distributed the property. The trial court found that husband "made significant financial contributions to the family[,]" that "both parties have made negative non-monetary contributions to the marriage[,]" and that wife's "nonmonetary contributions in the acquisition and care and maintenance of the marital property were significantly limited." The trial

court noted that husband "appeared to be in good physical condition" with no "evidence of a mental health issue." As for wife, the trial court found that "there appears to be conflicting evidence about the true extent of her condition." The trial court highlighted medical records indicating that wife was "sabotaging" her care by frequently changing physicians and misusing medications.

Based on its consideration of the statutory factors and its resulting findings, the trial court divided the marital estate. In making its award, the trial court awarded specific pieces of property to the party who primarily used that property[4] and considered such distribution when dividing financial assets. Ultimately, the trial court, subject to certain offsets, awarded wife half of the marital estate, with her share totaling nearly $600,000. Given the value of specific pieces of tangible property that were awarded to wife, the equitable distribution award required an equalizing payment of $371,128.31 from husband to wife.

The trial court then turned to calculating spousal support. The trial court found that the parties "lived above their means for a number of years during the marriage" and that husband's "wealth is something he acquired quite late in the 18-year marriage." The trial court highlighted husband's ability to pay support and noted it was awarding wife property and other assets worth in excess of $590,000 from the marital estate as part of equitable distribution. It also reiterated its findings about wife's lack of employment and her health issues.

Upon its consideration of the statutory factors, the trial court "award[ed] spousal support to [wife] in the lump sum amount of [$]1.3 million with no reservation to be paid within 30 days" of the final order. The trial court awarded a lump sum, over wife's objection, upon finding "significant benefits" to her in so doing. The trial court emphasized her immediate need, with no income, to find housing as well as "the need to place a deposit on utilities, car insurance, and homeowners'

---

[4] For example, wife was awarded custody of Huey, the horse acquired during the marriage that was valued at $75,000.

insurance." The trial court further wanted to insure against potential emergency contingencies. The trial court summarized that "[b]y awarding a significant lump sum amount, [wife] would have the money she needed readily available to pay these expenses and others that were not specifically addressed."

The trial court added that "[a] second significant advantage of a lump sum payment is that it would end the need for contact between the parties on anything to do with finances." Although the trial court acknowledged that it "could order any periodic payment to be made by wage deduction," it also recognized that "[a]ny contact by [wife] with [husband], especially concerning money, could negatively impact her functioning . . . ." The trial court emphasized wife's behavior at trial, whereby husband "was such a trigger that [wife] was concerned about being in the same room with him." The trial court speculated periodic support could require additional contact, "even if indirect," if husband were to fail to make payments or seek to modify his obligation, thereby inviting additional litigation.

The trial court discounted wife's argument about her difficulty in managing money, stating that it "is unconvinced the money will be managed any better if it is given periodically." The trial court observed that, despite its order directing husband to "pay for all the household expenses and then awarding an additional $5,000.00 in spousal support every month, [wife] overspent according to her own testimony by over $19,000.00 a month in 2019 and by over $3,000.00 a month in 2020." The trial court expressed that it was "skeptical that she will spend within her means regardless of the spousal support method."

Recognizing that, in general, "spousal support is given periodically because courts cannot anticipate what the needs of the payee will be in the future[,]" the trial court found that wife's "financial situation could hardly worsen." The trial court noted that "she spends significant periods of time in bed [and s]he needs someone to help manage every aspect of her life, including at times

helping her in and out of the shower." Finding that wife currently "needs constant assistance[,]" the trial court determined that it was "not speculative . . . to find that her financial need could not get much worse than it is at present."

The trial court also considered "the time value of money" whereby "[a]n earlier payment of the whole award gives [wife] more flexibility and a greater opportunity to take advantage of it." The trial court explained that, "using this principle, . . . if [wife] were to take the entirety of her lump sum award and buy a monthly annuity, she would receive larger payments than if the [trial c]ourt had ordered periodic support."[5] The trial court concluded, "[h]aving considered the above factors, the wife's need, and the husband's ability to pay, to the degree each was entered into evidence," that wife was entitled to a lump sum award of $1.3 million with no reservation.[6]

On September 24, 2021, the trial court entered its final order, "upon consideration of the evidence submitted to the [trial c]ourt, having considered the statutory factors as required by law . . . ." The order memorialized and incorporated the August 5, 2021 letter opinion. As for spousal support, the trial court noted its lump sum award of $1.3 million was made after "[t]aking into consideration all of the factors of Va. Code § 20-107.1 . . . ." The order reiterated that wife "shall not have a reservation of the right to petition for additional support." The trial court specified that it had "[found] special circumstances and compelling reasons to make this award, which is also fully adequate to meet [wife's] foreseeable needs" and that its rulings thus "anticipate reasonable

_____

[5] Although there were discussions about a potential annuity in the various proposals of the parties, no evidence was introduced about the stream of payments an annuity funded with $1.3 million likely would provide. The trial court did allow a continuance of the hearing to allow wife's counsel to investigate arrangements about support "to help provide financial structure for Ms. Foster, to help ensure her basic needs, mortgage, utilities, health insurance, et cetera, are paid" once husband stopped making those payments directly. Whether that structure was to be an annuity or some form of trust is not fully developed in the record.

[6] Wife requested a reservation during trial, but she did not assert on appeal that the decision of the trial court not to order a reservation constituted error. Accordingly, that issue is not before us.

contingencies for [wife.]"  The order further noted that "the lump sum award is equal to or greater than any amount the [trial c]ourt would be willing to enter in the form of periodic payments."

Wife now appeals.[7]  She challenges the trial court's classification of the Long & Foster stock and resulting proceeds as husband's separate property not subject to equitable distribution. Regarding spousal support, she asserts that the trial court erred in awarding it as a lump sum rather than periodic payments and in not awarding her a greater amount.  Finally, she argues that, in its conduct of the proceedings, the trial court "fail[ed] to make adequate accommodations for [her] disabilities under the Americans with Disabilities Act, and . . . fail[ed] to give due consideration to her ongoing medical issues throughout the trial[,]" which combined to deny her due process.

ANALYSIS

I.  Standard of review

"We begin our analysis by recognizing the well-established principle that all trial court rulings come to an appellate court with a presumption of correctness."  *Wynnycky v. Kozel*, 71 Va. App. 177, 192-93 (2019) (quoting *Stiles v. Stiles*, 48 Va. App. 449, 453 (2006)).  "In challenging [a] court's decision on appeal, the party seeking reversal bears the burden to demonstrate error on the part of the trial court."  *Sobol v. Sobol*, 74 Va. App. 252, 272-73 (2022) (quoting *Barker v. Barker*, 27 Va. App. 519, 535 (1998)).  We review legal questions *de novo*, *Jessee v. Jessee*, 74 Va. App. 40, 50 (2021); but "[a] factual determination cannot be reversed on appeal unless it is 'plainly wrong or without evidence to support it[,]'" *Friedman v. Smith*, 68 Va. App. 529, 543 (2018) (quoting *Congdon v. Congdon*, 40 Va. App. 255, 261 (2003)), and "[f]or those matters . . . that fall within the [trial] court's discretion, this Court cannot determine that an abuse of discretion has occurred unless 'reasonable jurists could not differ' on the conclusion that the court erred[,]" *Jessee*, 74 Va. App. at 49.  If a trial court's factual determination turns on the

---

[7] Execution of the final order was stayed pending appeal.

- 12 -

credibility of testifying witnesses and relies on testimony heard *ore tenus*, we are bound by the trial court's determination. *Anderson v. Anderson*, 29 Va. App. 673, 686 (1999) ("It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." (quoting *Street v. Street*, 25 Va. App. 380, 387 (1997) (*en banc*))).

## II. Classification of the Long & Foster stock

Wife asserts that the trial court erred in classifying the Long & Foster stock as husband's separate property. In doing so, she challenges a factual finding of the trial court because a trial "court's classification of property or debt is a finding of fact[.]" *Price v. Peek*, 72 Va. App. 640, 647 (2020). We owe deference to such a finding of fact, which "will not be reversed on appeal unless it is plainly wrong or without evidence to support it." *Id.* (quoting *Ranney v. Ranney*, 45 Va. App. 17, 31-32 (2005)).

"In making an equitable distribution of property under [Code § 20-107.3(A)], the [trial] court first must classify the property as separate, marital, or part separate and part marital." *Lightburn v. Lightburn*, 22 Va. App. 612, 616 (1996). Pursuant to the statute, marital property includes "property acquired by each party during the marriage which is not separate property" and defines separate property to include "all property acquired during the marriage by . . . gift from a source other than the other party [and] all property acquired during the marriage in exchange for or from the proceeds of sale of separate property, provided that such property acquired during the marriage is maintained as separate property . . . ." Code § 20-107.3(A)(1) and (2).

"[P]roperty acquired during marriage is presumed to be marital property." *Courembis v. Courembis*, 43 Va. App. 18, 34 (2004). Consistent with the statutory scheme, that presumption is rebuttable. The property is marital "unless adequate evidence is produced to establish that it is separate property as defined in Code § 20-107.3(A)(1)." *Id*. at 35 (quoting *Lambert v. Lambert*, 6

- 13 -

Va. App. 94, 99 (1988)). "[G]ifts from others to a party represent separate property" under the statute, *Sfreddo v. Sfreddo*, 59 Va. App. 471, 480 (2012), but the party "claiming property as separate has the burden to produce satisfactory evidence to rebut [the marital] presumption[,]" *Courembis*, 43 Va. App. at 35 (quoting *Rexrode v. Rexrode*, 1 Va. App. 385, 392 (1986)). We previously have explained that, in instances of "a gift to [a party], if there is credible evidence presented to show that the property was intended by the donor to be the separate property of [that party], the presumption is overcome, and the burden shifts to the party seeking to have the property classified as marital." *Stainback v. Stainback*, 11 Va. App. 13, 17-18 (1990).

"[I]n order to establish the existence of a gift, [husband] was required to prove, by clear and convincing evidence '(1) the intention on the part of the donor to make the gift; (2) delivery or transfer of the gift; and (3) acceptance of the gift by the donee.'" *Monds v. Monds*, 68 Va. App. 674, 688 (2018) (quoting *Robinson v. Robinson*, 46 Va. App. 652, 665 (2005) (*en banc*)). "[Donative i]ntent is a question to be determined by the fact finder." *Cirrito v. Cirrito*, 44 Va. App. 287, 305 (2004). It is insufficient to show that the purported donor developed donative intent at some point during an exchange or transaction; rather, husband was required to establish that his uncle possessed "donative intent at the time of the [purported] gift[.]" *Young v. Young*, 240 Va. 57, 63 (1990).

The evidence was sufficient to support the trial court's conclusion that the transaction represented a gift of the stock to husband.[8] The testimony of husband, Enger, and Wagy amply support the conclusion that the transaction was designed as a means of carrying out uncle's intent to give the shares of Long & Foster stock to husband. Their testimony finds further support in

---

[8] At oral argument in this Court, wife, with credible candor, conceded that the standard of review was "strongly against [her] position[,]" that the existence of donative intent was a question of fact, and that, regarding the trial court's conclusion that uncle's intention from the outset was to give the stock to husband, there was evidence that would "support that interpretation" of events.

- 14 -

contemporaneous emails and other documents that describe the purpose of the transaction as "gifting shares to [husband]." Because there is ample evidence to support the trial court's conclusion that the entire transaction represented a gift of stock to husband alone, the standard of review dictates that we affirm the trial court's judgment on this issue.

Our decision in *Stainback* does not require a different result. In *Stainback*, as here, a husband acquired from a relative a tranche of stock that was financed by a loan from a relative that ultimately was forgiven. 11 Va. App. at 16. There was conflicting evidence as to whether the transaction, from its inception, had been intended as a gift and as to how the parties treated the stock/loan during the marriage, but it was undisputed "that the dividends from the stock were used for family purposes" during the marriage. *Id.* Faced with conflicting evidence on the question of whether the transaction represented a gift of stock to the husband alone, the trial court found that it was a loan that constituted a marital debt; we affirmed that judgment because "[a] review of the record before us indicate[d] that the trial court's determination that this transaction was a loan . . . is supported by credible evidence." *Id.* at 19.

Several dispositive distinctions are apparent. Unlike the case in *Stainback*, the evidence here did not demonstrate that either the loan or the stock was ever procured by or utilized as marital property as opposed to husband's separate property. No funds, marital or otherwise, were ever used to pay down the note, and evidence established that, unlike the dividends in *Stainback*, nothing related to the stock was ever utilized for marital purposes.[9] Furthermore, and perhaps more importantly, the trial court in *Stainback*, unlike the trial court here, considered the

---

[9] Evidence offered by husband and his experts at trial established not only that no marital funds were used to acquire the stock, but that the proceeds of the sale of the stock were also kept separate. On appeal, wife does not challenge the evidence of tracing or the trial court's conclusion regarding tracing. Thus, the issue of the commingling of a potential separate asset with marital assets that was part of the trial court's (and hence our) decision in *Stainback* is absent here.

- 15 -

conflicting evidence and concluded that the transaction represented a loan that constituted marital debt.[10] Because there was credible evidence to support that conclusion, we affirmed. *Id*. Here, the trial court reached the opposite conclusion, that, from its inception, the transaction represented a gift to husband alone.[11] Because credible evidence supports that conclusion, we similarly affirm the judgment of the trial court in this case.

---

[10] We affirmed the *Stainback* court's decision because there was evidence to support both the conclusion that the transaction was a loan and that the loan represented marital debt. Having done so, we, in *dicta*, offered additional explanation, noting "that had the father died prior to formally forgiving the note, the child, here the husband, would have been liable on the note to the father's estate" and that the shares of stock "were properly classified as marital property" because "[t]hey were acquired during the marriage for consideration and were not acquired in exchange for, or from the proceeds of sale of, separate property." *Stainback*, 11 Va. App. at 20. These observations naturally flow from the conclusion that the transaction was a loan, not a gift, and that the loan constituted marital and not separate debt. They are not applicable to this case because the trial court here found that the transaction was a gift of separate property, that the property was not acquired in exchange for any consideration, and that no part of the transaction, whether viewed as a gift or a loan, was ever marital.

[11] The concurrence places great significance on the fact that, like here, there was evidence in *Stainback* that "the donor '*never* intended to enforce collection of the debt.'" Concurrence at 26, *infra* (quoting *Stainback*, 11 Va. App. at 19) (emphasis in concurrence). This ignores that, unlike here, there was conflicting evidence in *Stainback* on this issue. Mrs. Stainback "testified that [Mr. Stainback] signed a promissory note evidencing a $71,000 debt to his father, and that after the suit was instituted, [Mr. Stainback] *told her he owed his father $71,000*," belying the claim that it was understood from the outset that the debt was not to be collected. *Stainback*, 11 Va. App. at 19 (emphasis added). Furthermore, Mrs. Stainback testified that it was her understanding that the loan was to be repaid, testifying that the plan was for the loan to "be retired when the stock was sold." *Id*. Finally, as summarized by the *Stainback* majority, "it was uncontroverted that the parties treated the transaction as a loan" with Mr. Stainback "acknowledg[ing] the debt in two pretrial depositions, on a written financial profile prepared during the litigation, and in a post-separation conversation with" Mrs. Stainback. *Id*. In ruling in favor of Mrs. Stainback on this issue, the trial court, as trier of fact, is presumed to have accepted her evidence and rejected husband's evidence regarding the donor's intent referenced above. Thus, the fact that there was evidence that would have allowed the trier of fact to conclude that the donor never intended to collect the debt is of no moment on appeal. *Sims v. Sims*, 55 Va. App. 340, 348 (2009) ("If there is credible evidence in the record supporting the factual findings made by the trier of fact, we are bound by those findings regardless of whether there is evidence that may support a contrary finding." (quoting *Galloway v. Galloway*, 47 Va. App. 83, 92 (2005))).

Finally, we note that, even if the transaction more properly is viewed as a loan, no different result obtains. Like assets, debt acquired during the marriage is presumptively marital, and that presumption similarly may be rebutted. *See* Code § 20-107.3(A)(5). Here, the evidence and the trial court's findings wholly support the conclusion that, however characterized, the transaction was outside of the marital estate. No marital funds were ever used regarding the transaction, and all of the participants were clear that wife was never intended to be part of the transaction. Furthermore, despite going to great lengths to reduce his tax liability, uncle knowingly incurred $14,000 in additional taxes by reporting the transaction as a gift to husband alone as opposed to a gift to husband and wife. Wife offered no evidence to counter the testimony or other evidence to show that uncle's "loan" to husband had a marital purpose; therefore, the record clearly supports the trial court's finding that wife was not a participant in nor intended beneficiary of the transaction.

Thus, even if the transaction was a forgiven loan as opposed to a gift of the stock, the loan, the stock, and the proceeds were husband's separate property/debt. As we previously have observed, albeit in an unpublished opinion, about a similar situation,

> husband and his uncle did borrow money during the marriage to purchase additional rental properties. They secured those loans with deeds of trust on the property purchased. They borrowed funds on their signatures alone, and neither of their wives signed any of the loan documents. *No marital funds were used to repay the indebtedness on any of the properties*. Property is acquired under the source of funds rule whenever real economic value is created. When a party borrows money to buy property, the economic value of the property is created as the debt is paid. The husband proved that the debts incurred to purchase new properties were repaid with income derived from separate property, which was itself separate property. Code § 20-107.3(A)(1). *The fact that the husband incurred the debt during the marriage does not alone make the property they acquired with its proceeds marital. Neither Stainback nor Wagner[12] permits that interpretation.*

---

[12] *Wagner v. Wagner*, 4 Va. App. 397 (1987). Relied on by the concurrence, *Wagner* is distinguishable from the instant case. Unlike this case in which the evidence established that the

- 17 -

*Simpson v. Simpson*, 05 Vap UNP 1815042, No. 1815-04-2, slip op. at 4-5 (Va. Ct. App. Apr. 26, 2005) (internal citation omitted) (emphasis added).[13]

Ultimately, the question raised by wife here is whether the trial court erred in concluding that the transaction was designed to convey the Long & Foster stock to husband alone without husband (or wife) supplying any consideration in return. Because the evidence amply supports that conclusion, we affirm the trial court's judgment regarding the classification of the Long & Foster stock (and the resulting proceeds) as husband's separate property.

### III. Spousal support

Wife also challenges the trial court's judgment regarding spousal support. Specifically, she contends that the trial court erred "in determining that an award of a lump sum, rather than periodic spousal support, was appropriate" and "in determining that the amount awarded as a lump sum for spousal support was adequate[.]"

Code § 20-107.1(C) provides that upon divorce of the parties, a trial court, "in its discretion, may decree that maintenance and support of a spouse be made in periodic payments for a defined duration, or in periodic payments for an undefined duration, or in a lump sum award, or in any combination thereof." It is well settled that "[t]he trial court has broad discretion in awarding and

_____

transaction was a gift from its inception, the evidence in *Wagner*, as summarized by the *Wagner* majority, established that, at the inception of the transaction, the transfer "was not a gift" and that the donor only "eventually forgave the debt incurred to purchase the property" in question. *Id*. at 402. Because donative intent must exist at the beginning of the transaction, *Young*, 240 Va. at 63, this represents a distinction with a difference.

[13] We recognize that, "[a]lthough an unpublished opinion of the Court has no precedential value, a court [may] consider[] the rationale and adopt[] it to the extent it is persuasive." *Fairfax Cnty. Sch. Bd. v. Rose*, 29 Va. App. 32, 39 (1999) (internal citation omitted). In a coincidence, the transaction in *Simpson*, as the transaction in this case, involved both the divorcing husband and his uncle. The references in the block quote above to "husband" and "uncle" refer to Simpson and his uncle; all other references to "husband" and "uncle" in this opinion refer to Foster and his uncle.

fixing the amount of spousal support." *Benzine v. Benzine*, 52 Va. App. 256, 260 (2008) (quoting

*Miller v. Cox*, 44 Va. App. 674, 679 (2005)). "When a court awards spousal support based upon

due consideration of the factors enumerated in Code § 20-107.1, as shown by the evidence, its

determination 'will not be disturbed except for a clear abuse of discretion.'" *Chaney v.*

*Karabaic-Chaney*, 71 Va. App. 431, 435 (2020) (quoting *Dodge v. Dodge*, 2 Va. App. 238, 246

(1986)). "Accordingly, our review is limited to determining whether the trial court clearly abused

its discretion." *Miller*, 44 Va. App. at 679.

"An abuse of discretion occurs only when reasonable jurists could not differ as to the proper

decision." *Wynnycky*, 71 Va. App. at 193 (quoting *Reston Hosp. Ctr., LLC v. Remley*, 63 Va. App.

755, 764 (2014)). The abuse-of-discretion standard "necessarily implies that, for some decisions,

conscientious jurists could reach different conclusions based on exactly the same facts—yet still

remain entirely reasonable." *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013). Our use of this

deferential standard of review "rests on the venerable belief that the judge closest to the contest is

the judge best able to discern where the equities lie." *Id*.

Having established the lens through which we review wife's challenge to the trial court's

award of spousal support, we address each of her arguments in turn.

### A. Lump sum award

"Although the trial court has 'discretion in deciding whether to order periodic or lump sum

payments, periodic payments are the preferred form.'" *Taylor v. Taylor*, 27 Va. App. 209, 217

(1998) (quoting *Mosley v. Mosley*, 19 Va. App. 192, 197 (1994)). Accordingly, "a trial court . . .

must find 'special circumstances or compelling reasons' when it awards a lump sum for spousal

support." *Id*. (quoting *Blank v. Blank*, 10 Va. App. 1, 5 (1990)). We review the trial court's

determination that sufficient special circumstances exist to justify a lump sum award for an abuse of

discretion. *Poliquin v. Poliquin*, 12 Va. App. 676, 679-80 (1991).

In painstaking detail, the trial court dedicated nearly two single-spaced pages of its letter opinion to the facts that led it to conclude that a lump sum award was appropriate in this case. Although it detailed many reasons, central to the trial court's decision was its conclusion that a lump sum award "would end the need for contact between the parties on anything to do with finances." The trial record amply supports that this was a valid concern and constituted a sufficient special circumstance to justify the decision to address support in a lump sum.[14]

Although many, if not most, divorces result in acrimony between the divorcing spouses that makes dealing with one another difficult, the evidence here demonstrates acrimony and difficulty that is different in kind and not just degree than the average case. Wife made clear that even being in husband's presence at trial was "triggering" for her and caused significant mental and emotional hardship. To address wife's concerns, the trial court conducted part of the trial with husband out of the courtroom and, when he was present, positioned a deputy so that wife would not have to see him. Given that wife made clear that the mere sight of husband caused her great pain and anguish, it was reasonable for the trial court to fashion a spousal support solution that eliminated the need for future contact. Because alternative methods, such as periodic, automatic electronic withdrawals from husband's bank account, leave open the possibility for future contact in ways that a one-time lump sum payment does not, the trial court reasonably concluded that such an alternative scheme was not the best solution. Because the trial court considered all of the relevant information and reasonably concluded that a lump sum spousal

---

[14] In finding that ending or limiting continued contact between the parties was a sufficient reason for the trial court to order a lump sum award, we do not reject the other reasons listed by the trial court. Our charge is to decide cases on the "best and narrowest ground[,]" *Chaney*, 71 Va. App. at 438, and our conclusion that the trial court reasonably determined that a lump sum award was needed to limit contact between parties whose contact should be limited is the best and narrowest way to resolve this issue.

payment was in the best interests of both parties, it did not abuse its discretion. Accordingly, we affirm the judgment of the trial court to make a lump sum spousal support award.

## B. Amount of award

In asserting that the trial court "erred in determining that the amount [of spousal support] awarded . . . was adequate[,]" wife again challenges the trial court's exercise of discretion.[15] *Chaney*, 71 Va. App. at 435. A review of the record reveals no such abuse of discretion.

A trial court's award of spousal support is governed by statute. *See* Code § 20-107.1. For a trial court's spousal support award to be valid, the trial court must consider "all the factors contained in Code § 20-107.1" for which evidence was presented. *Chaney*, 71 Va. App. at 435 (quoting *Ray v. Ray*, 4 Va. App. 509, 513 (1987)). In reviewing a challenge to the amount of a spousal support award "[w]hen the record discloses that the trial court considered all of the statutory factors," *Gamble v. Gamble*, 14 Va. App. 558, 574 (1992), we do not reweigh the evidence or the statutory factors. Rather, we will affirm the amount of support awarded by the trial court unless it "is plainly wrong or without evidence to support it[,]" *id.*

Here, the record amply demonstrates that the trial court considered the statutory factors in detail. Over more than four single-spaced pages of its letter opinion, the trial court detailed each of the statutory factors, the evidence that was adduced regarding each factor, and the relative significance or weight it gave each statutory factor. Thus, the record establishes that, in determining the amount of the award, "the trial court considered all of the statutory factors[.]" *Id.*

---

[15] Wife also asserts that the award "was substantially less than the present-day value of the periodic support that should have been awarded." However, she does not suggest on appeal what she contends an appropriate monthly amount of support would be or the appropriate duration of such a periodic award. Assuming a periodic award lasting for a 224-month period equal to the length of the marriage, the $1.3 million lump sum award equates to a monthly spousal support payment in excess of $5,800 before assigning a benefit to wife for her enjoyment of having the money now as opposed to the payments being spread over more than eighteen years.

Similarly, the record reflects that the amount of the award is neither "plainly wrong [n]or without evidence to support it." *Id.* In her challenge to the amount of the award, wife focuses on husband's "present ability to pay spousal support" and unspecified, largely unquantified needs of wife going forward. Although "the amount of support is based on current needs of the spouse . . . and the ability of the other spouse . . . to pay from current assets[,]" *Conley v. Bonasera*, 72 Va. App. 337, 350 (2020) (first alteration in original) (quoting *Williams v. Williams*, 4 Va. App. 19, 24 (1987)), the record reflects the trial court considered both husband's ability to pay and wife's needs in crafting the award.

As wife argues, the record reflects that husband has substantial assets and income, and thus currently has the ability to pay spousal support. Of course, husband never disputed that he had the ability to pay spousal support or that he should pay spousal support. As the trial court noted in its letter opinion, husband "has financial resources exceeding six million dollars on top of a significant yearly cash flow. Thus, as [husband] himself concedes, he has the ability to pay spousal support." Accordingly, the record reflects that, contrary to wife's argument, the trial court did take into account husband's current ability to pay.[16]

Wife also argues that the award failed to take into account her current needs. Again, the record belies this contention. In crafting the award, the trial court expressly considered wife's specific needs. In addition to noting wife's health/emotional issues, the trial court expressly found that wife "will need financial support and she will need it immediately" in order "to buy a home

---

[16] To the extent that wife's argument is that husband had sufficient assets to pay more than the $1.3 million that he was ordered to pay, such an argument misunderstands the law. Although the trial court is required to consider a party's ability to pay spousal support, the statutory scheme does not require an award be set at the maximum amount that the party conceivably could afford to pay. To the contrary, ability to pay is but one factor to consider. Here, the trial court considered husband's ability to pay and, balancing that fact against the other statutory factors, concluded that an award of $1.3 million was appropriate. Nothing in the record establishes that this determination was error.

and pay for its upkeep, maintenance, and utilities.  She will also need further capital to pay for everyday expenses such as food, clothing, and the upkeep of her horse."  Clearly, the trial court considered wife's needs in crafting the $1.3 million award, and nothing in the record establishes that the $1.3 million award is insufficient to meet those needs or to maintain wife in a lifestyle commensurate with the lifestyle of the parties for the majority of the marriage.[17]

Because the trial court considered all of the statutory factors, including husband's ability to pay and wife's need for support, and nothing in the evidence suggests that the amount is unreasonable or plainly wrong, we affirm the trial court's judgment regarding spousal support.

IV.  Accommodations for wife during trial

Wife contends that the trial court "erred in failing to make adequate accommodations for [her] disabilities under the Americans with Disabilities Act" and "prejudic[ed] [her] right to due process" by "failing to give due consideration to her ongoing medical issues throughout the trial." On brief in this Court, wife acknowledges that "this issue may not have been adequately preserved in the record" because "the principal source for the objection was raised by a brief filed by an out-of-state attorney who had not been admitted *pro hac vice*[,] whose motion to file a brief *amicus curiae* was not expressly granted[,]" and who never entered an appearance of record for wife.[18]

---

[17] Although providing no specifics regarding how the award is insufficient or what amount is necessary to meet her needs as she perceives them, wife seems to argue that her demonstrated record of profligate spending entitles her to a larger award.  The record reflects that wife did overspend the $5,000 a month *pendente lite* support award by $19,000 *a month* in 2019 and by $3,000 *a month* in 2020.  A person's ability to spend large sums of money, to include spending well beyond his or her means, does not establish a need for such amounts of money to maintain the necessaries of life or even to maintain a particular lifestyle.

[18] Although recognizing its likely insufficiency to preserve the issue, wife points to a friend of the court brief that an out-of-state lawyer named Peter D. Ward attempted to file in the case below.  As wife acknowledges, Ward was "not . . . admitted *pro hac vice*" and the motion to file the *amicus* brief "was not expressly granted."  Accordingly, the matter was not properly preserved.  Even if we were to assume that the purported *amicus* brief was sufficient to preserve

Rule 5A:18, often referred to as the contemporaneous objection rule, provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling[.]" As she essentially acknowledges on brief, wife did not raise the specific issue or argument she raises on appeal in the trial court. The specific issue was not raised by her counsel of record, and she points to no circumstance in which either she or her counsel requested a particular reasonable accommodation that the trial court denied. Accordingly, the issue was not preserved below, and we are barred from considering it on the merits.

Recognizing that her present appellate argument regarding alleged disabilities was not preserved in the trial court, wife asks us to address it anyway "under the ends of justice exception of Rule 5A:18." "'The ends of justice exception is narrow and is to be used' when an error at trial is 'clear, substantial and material.'" *Frango v. Commonwealth*, 66 Va. App. 34, 48 (2016) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220-21 (1997)). "In order to avail oneself of the exception, a [party] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Id.* (quoting *Redman*, 25 Va. App. at 221).

Wife cannot make such a showing here. Although the trial court had doubts about the extent of wife's claimed physical, mental, and emotional issues, the trial court still took steps to accommodate wife during the proceedings below, up to and including the trial. Wife was granted numerous continuances over the course of the litigation to address various issues she

the issue, it could only preserve the issue raised in that brief, which is not the issue asserted on appeal. The specific issue raised in the purported *amicus* brief dealt with the potential prejudice wife was suffering at the hands of a prior counsel and might suffer if prior counsel were permitted to withdraw. Although that prior counsel was permitted to withdraw, wife obtained other counsel in advance of trial and was represented by competent counsel throughout the trial. Written months prior to trial, the purported *amicus* brief could not raise a specific objection to how the trial court eventually would conduct the trial because that was unknown at that time. Neither counsel at trial nor counsel on appeal points to any request for a reasonable accommodation *at trial* that wife was denied.

experienced. During trial, the trial court sought to accommodate wife by taking the extraordinary steps of conducting portions of the trial without husband present, having husband sit at a location within the courtroom where wife could not see him, and even ordering a courtroom deputy to position himself so wife could not see husband. That the trial court clearly took steps to accommodate wife's claimed disability is underscored by the fact that neither her counsel at trial nor her counsel on appeal points to any request for a reasonable accommodation during trial that wife was denied. Simply put, the record does not reflect that the trial court unreasonably failed to accommodate any claimed disability of wife during the trial, and therefore, wife has not "affirmatively show[n] that a miscarriage of justice has occurred[.]" *Id*. Accordingly, the ends of justice exception to Rule 5A:18's contemporaneous objection rule does not apply.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*

Raphael, J., concurring.

I join the majority opinion and agree with the Court's disposition of wife's challenges to the lump-sum spousal-support award and her claim that she was not adequately accommodated at trial. I also agree that the trial court did not err in concluding that the 1,008 shares held by husband in the Foster trust is his separate property, but I reach that conclusion for different reasons than the majority.

The majority finds *Stainback v. Stainback*, 11 Va. App. 13 (1990), distinguishable because it concludes that credible evidence supported the trial court's finding that the transaction there was a loan. *Supra* at 15. The majority says, *supra* at 16 n.10, that it was *dicta* when we said in *Stainback* that, "had the father died prior to formally forgiving the note, the child, here the husband, would have been liable on the note to the father's estate," *Stainback*, 11 Va. App. at 20. We said the same thing in *Wagner v. Wagner*, 4 Va. App. 397 (1987). *See* 4 Va. App. at 404 ("[H]ad the wife's father died prior to forgiving the note in December 1976, the wife would have been liable on the note to her father's estate."). Indeed, *Wagner* treated that point as dispositive as a matter of law, saying that "fact also *mandates* the conclusion that the property, on the date it was acquired, was not a gift qualifying as the separate property of the wife." *Id*. (emphasis added).

It was precisely *because* the transaction in *Stainback* was structured as a loan, not a gift, that the Court found the transaction to be a loan, notwithstanding the intent of the father at the outset to forgive the debt. In *Stainback*, as here, the donor "*never* intended to enforce collection of the debt." 11 Va. App. at 19 (emphasis added). Nonetheless, we said that "the trial court's determination that this transaction was a loan *evidenced by a promissory note* is supported by credible evidence." *Id.* (emphasis added). I think that the majority does not give sufficient weight to the "evidenced by a promissory note" language.

- 26 -

In fact, the structure of the transaction as a loan "evidenced by a promissory note," *id.*, was essential to the disposition in *Stainback*. Judge Moon dissented *because* he thought the majority put too much weight in that formality. He lamented that "[t]he substance of the transaction is what matters," not "that the gift was accomplished in a manner designed to avoid estate and gift taxes." *Id.* at 26 (Moon, J., dissenting).

In short, if *Wagner* and *Stainback* are still good law, it is not enough to classify the transaction here as a "gift" simply because the donor intended from the outset that the transaction would ultimately result in a gift. Just like the donor in *Stainback* and *Wagner*, had uncle died before releasing the promissory note, husband "would have been liable on the note to [uncle's] estate." *Id.* at 20. Code § 64.2-514 requires every personal administrator of an estate to "administer, well and truly, the whole personal estate of his decedent." That means that the "[p]ersonal representatives of an estate are obligated to collect the assets of the estate, which includes a duty to reduce the estate's claims to judgments." *O'Brien v. O'Brien*, 259 Va. 552, 557 (2000); *see also Campbell v. Harmon*, 271 Va. 590, 599-600 (2006) (same). So even when the estate includes a promissory note signed by a *family* member payable to the decedent, the personal representative is obligated to enforce the note. *Isbell v. Flippen*, 185 Va. 977, 981 (1947). Failing to do so "is negligence, for which the personal representative may be liable." *Id.*; *see also* Code § 64.2-1415(A) (imposing liability on a personal representative who, "by his negligence or improper conduct, loses any debt or other money").

For instance, when the personal representative in *Isbell* sought to enforce the promissory note signed by the decedent's brother, the Supreme Court rejected the brother's defense that the decedent "never intended to exact a repayment." 185 Va. at 981. That claim was ineffective because the promise to waive repayment was not "in writing." *Id.* at 983. *Isbell*'s holding is now codified in Virginia's Uniform Commercial Code, under which a "signed writing" is

required for a promissory note to be canceled. *See* Code § 8.3A-604(a) ("A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument . . . (ii) by agreeing not to sue or otherwise renouncing rights against the party by a signed writing.").[19]

The record here likewise discloses no such "signed writing" by uncle before he forgave the loan and canceled the promissory note four months after husband signed it. So just as in *Isbell*, if uncle had died before canceling the note, husband would have owed the debt to uncle's estate. And applying the logic of *Stainback*, husband's debt would have been marital debt, making the stock he purchased marital property. For those reasons, I do not believe that the majority has persuasively distinguished *Stainback.*

The majority points out, in the alternative, that "even if the transaction more properly is viewed as a loan, no different result obtains." *Supra* at 17. I agree, but again, I reach that conclusion through a slightly different analysis.

*Stainback* and *Wagner* are distinguishable because the rules governing the determination of marital debt have changed since those cases were decided. As explained below, under the law in effect in 2016, when husband signed the promissory note to uncle, the debt that was temporarily created (before being forgiven) was husband's separate debt under Code § 20-107.3(A)(5)(ii), not marital debt; and so the stock that husband purchased with the loan was his separate property under Code § 20-107.3(A)(1).

For many years before 2010, the "practice across the [C]ommonwealth in all courts was that if a debt was incurred during the marriage, it was presumed to be marital property, even if

_____

[19] The obligation also may be released if "the instrument is delivered up to the person primarily liable thereon." *Isbell*, 185 Va. at 983; Code § 8.3A-604(a)(i) (providing that the debt may also be discharged "by an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation, or cancellation of the instrument").

incurred in the name of one party." Ronald R. Tweel, Elizabeth P. Coughter & Jason P. Seiden, *Family Law*, 46 U. Rich. L. Rev. 145, 163 (2011). Consistent with that approach—and with *Wagner* and *Stainback*—our Court held in *Gilliam v. McGrady*, 53 Va. App. 476 (2009), that debt contracted by one spouse during the marriage was presumptively marital debt, just as property acquired by one spouse was presumptively marital property. *Id.* at 483-84.

The Supreme Court disagreed, however, finding on appeal in *Gilliam* that Code § 20-107.3 did not specify the rules for determining marital debt. *Gilliam v. McGrady*, 279 Va. 703, 709 (2010). In the absence of a statutory directive, the Supreme Court held that the "traditional rules concerning the allocation of the burden of proof apply." *Id.* at 710. That is, "proof that a debt was incurred by a single spouse makes a prima facie showing that the debt is separate, shifting to the party contending otherwise the burden of persuading the court that it was marital." *Id. Gilliam* "reversed twenty-five years of practice and decisions of trial courts and the court of appeals concerning . . . allocation of debts." Tweel, *supra*, at 145.

The very next year, however, the General Assembly amended Code § 20-107.3, superseding *Gilliam* and codifying different rules for determining marital debt. *See* 2011 Va. Acts ch. 655.[20] The 2011 amendment added subsection (A)(4), governing separate debt, and (A)(5), governing marital debt. Subsection (A)(5) provides that debt incurred "in either party's name" during the marriage and before the last separation is "marital debt." Code § 20-107.3(A)(5)(ii). But there is an exception:

> [If] a party can show by a *preponderance of the evidence* that the
> debt, or a portion thereof, was incurred, or the proceeds secured by
> incurring the debt were used, in whole or in part, *for a nonmarital*

---

[20] *See also* Dale M. Cecka, James R. Cottrell & Craig W. Sampson, *Va. Prac. Family Law* § 11:35 (2022 ed.) (stating that the 2011 amendment was a "specific response" to *Gilliam*); 2 Brett R. Turner, *Equitable Distribution of Property* § 6:97, at n.9 (4th ed. 2021) (stating that subsection (A)(5) "overrules *Gilliam*").

> *purpose*, *the court may designate the entire debt as separate* or a portion of the debt as marital and a portion of the debt as separate.

*Id*. (emphasis added).

Under that now-codified standard, the evidence sufficed here to show that the entire $4.3 million debt temporarily incurred by husband in executing the promissory note to uncle was "for a nonmarital purpose"—purchasing 1,008 shares of stock in the trust that uncle ultimately intended as a gift to husband as his separate property. As husband testified, uncle

> wanted to gift stock to me that would be worth about $10 million . . . . The idea was, [uncle] was going to loan me approximately $4.3 million. I was going to buy 1,008 shares of Class B stock. He would forgive the loan a couple months later . . . . So they did it that way to effectuate a gift.

Wife offered no evidence to counter that testimony or the other evidence summarized by the majority.

Code § 20-107.3(A)(1)(iii) provides that separate property includes "all property acquired during the marriage in exchange for . . . separate property, provided that such property acquired during the marriage is maintained as separate property." Because the evidence showed that the debt that husband temporarily incurred to purchase stock in the trust was his separate debt (before being forgiven by uncle), and because husband used the loan proceeds for which he incurred that debt to purchase stock in the trust, that stock was husband's separate property under Code § 20-107.3(A)(1).

In short, I get to the same place as the majority in concluding that the trial court was correct in finding that the stock in the Foster trust is husband's separate property. But I think that *Stainback* would require a different result without the 2011 amendments to Code § 20-107.3.

- 30 -